Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Matthew F. Kennelly | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 7178 | **DATE** | 12/17/2001 |
| **CASE TITLE** | Motor Works vs. BMW | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)  ☐ General Rule 21  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. Defendant's objection to plaintiff's submission of plaintiff's exhibits 38, 66, 67, and defendant's unused exhibits 93 and 94. The Court denies plaintiff's motion for a preliminary injunction (10-2). The case is set for a telephone status hearing on 1/17/02 at 9:00 a.m.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | **Document Number** |
|---|---|---|---|---|
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | DEC 20 2001 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 69 |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| OR | courtroom deputy's initials | DEC 20 PM 2:49 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MOTOR WERKS PARTNERS, L.P., ) <br> ) <br> Plaintiff, ) <br> ) <br> vs. ) <br> ) <br> BMW OF NORTH AMERICA, INC., ) <br> ) <br> Defendant. ) | Case No. 01 C 7178 |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff Motor Werks Partners, L.P. (MWP) has sued defendant BMW of North America, Inc. (BMWNA), claiming that BMWNA's refusal to supply MWP with a new model of automobile called the Mini violates MWP's franchise agreement and various statutes. On September 20, 2001, Chief Judge Marvin Aspen denied MWP's motion for a temporary restraining order. The case was thereafter transferred to this Court's docket. On November 28-29, 2001, the Court held a hearing on MWP's motion for a preliminary injunction. In the motion, MWP seeks an order precluding BMWNA from denying MWP the right to sell the Mini.

### Facts

BMWNA is the exclusive North American distributor of motor vehicles manufactured by Bayerische Motoren Werke AG (BMW AG), a German corporation. MWP has operated a very successful BMW automobile dealership in Barrington, Illinois for over twenty years. MWP's most recent franchise agreement with BMWNA was executed in 1993. In the 1993 Dealer Agreement, BMWNA agreed "to sell and deliver BMW Products to [MWP] in accordance with

the Agreement" and to "endeavor to make a fair and equitable allocation and distribution of the BMW Products available to [MWP] among its BMW Dealers." The term "BMW Products" was defined to include "BMW Vehicles," which in turn was defined to include "new passenger car(s) manufactured by BMW or one of its manufacturing subsidiaries, sold by BMWNA, and bearing the trademarks of BMW." 1993 Agreement, Dealer Standard Provisions at 1, 3.

MWP and BMWNA have had a number of disputes over the years, culminating in the termination of MWP as a BMW dealer in 1999. Following litigation, the parties reached a settlement which was embodied in a written settlement agreement signed in June 2000. In the settlement agreement, among other things, BMWNA withdrew its termination of MWP, and MWP undertook to "sign and agree[ ] to comply with ... BMW's standard dealer agreement for cars when the new version of that agreement is available." Settlement Agreement ¶24.

In 1994, BMW AG acquired a British company which owned the rights to several automobile trademarks, including those associated with a vehicle called the Mini Cooper, an automobile first manufactured in the late 1950's. Eventually BMW AG decided to reintroduce the Mini to the North American market, a decision announced at the Detroit Auto Show in January 2000. In the summer of 2000, BMWNA advised its approximately 340 existing BMW dealers that a separate dealer network would be created to sell the Mini in North America. Dealers were told that they would be required to apply to BMWNA to become a Mini dealer if they wanted to be able to sell the Mini when it was rolled out in early 2002, and that BMWNA anticipated that it would appoint only 70 Mini dealers. Applications and information regarding the application process were made available on BMWNA's website. The deadline for submitting applications was in October 2000. Just over 150 dealers applied.

2

MWP was aware of all of these developments but did not submit an application. At the hearing, MWP's principals testified that the company did not submit an application because it believed it had an entitlement under the 1993 Dealer Agreement to receive and sell Minis and thus did not have to submit an application or be approved as a Mini dealer. In February 2001, MWP sent BMWNA a letter requesting a copy of the Mini dealer application information that had been made available on the World Wide Web in October 2000. BMWNA sent MWP the requested information but advised it that the deadline for submitting proposals had passed.

MWP had no further communications with BMWNA concerning the Mini until May 11, 2001, when it first advised BMWNA of its view that it was entitled to receive and sell Minis under the 1993 Agreement. By that time, BMWNA had already selected 70 prospective Mini dealers from among the 150 proposals it had received. BMWNA provided MWP (and other BMW dealers) with a new dealer agreement in July 2001, but MWP has declined to execute it. The new standard dealer agreement specifically excludes the right to sell the Mini.

Among the requirements that BMWNA imposed on prospective Mini dealers was to set up a separate sales organization and devote 2000 square feet of architecturally separate showroom space for the display of the Mini. The evidence at the hearing showed that dealer applicants invested significant amounts of time and money (anywhere from $300,000 to, in one case, over $6,000,000) to satisfy these and the other requirements that BMWNA set.

BMWNA also established a detailed set of criteria that it would consider in determining which applicants to approve. The process of reviewing and approving applications was lengthy and time-consuming, and it involved multiple meetings between BMWNA representatives and dealer applicants to review their proposals. In some cases these meetings led to revision of the

3

applicants' proposals.

BMWNA's decision to appoint only 70 Mini dealers stemmed from the fact that it anticipated that the first-year production run of Minis would yield only 20,000 Mini vehicles for the North American market. BMWNA has endeavored to do its best to enable Mini dealers to make a profit on their sales of the vehicle. Through a financial analysis, it determined that the average dealer would have to sell 25 Minis per month (300 per year) to break even. Because BMWNA had made a decision to provide equal allocations of vehicles to all Mini dealers, it determined that it could designate no more than 70 dealers so that each would receive approximately 300 cars in the first year.[1] As things have turned out, it is questionable whether first year production levels will actually reach 20,000.

In April 2001 the field was narrowed down to 70 "dealer candidates," and BMWNA issued letters of intent to each of them. The letters of intent spelled out the requirements that the candidates would have to meet in order to be finally approved. BMWNA anticipates that dealer agreements for the approved Mini dealers will be executed in March 2002. The first Mini automobiles are expected to be delivered to the United States that same month, and retail sales are expected to begin in April 2002.

In the summer of 2001, BMWNA established a web site that identified all 70 of the approved dealer candidates. The web site enables interested persons to locate the prospective Mini dealer closest to their residence. It has retained an architectural firm that is working with the dealer candidates in their establishment of separate showroom space (the cost of this

---

[1] BMWNA has made no contractual commitments to Mini dealers regarding the quantity of Mini autos that they will receive.

4

eventually will be charged back to the dealers) and has required the dealers to undergo training to market and sell the Mini.

BMWNA received applications from seven Chicago-area BMW dealers; it decided to designate only three to be Mini dealers: Patrick, Bill Jacobs, and Knauz. The decision to designate only three dealers in this area was based on a number of factors, including the overall number of dealers to be designated nationwide, and a desire to distribute dealerships geographically around the Chicagoland area. There is no evidence that the decision to designate only three Chicago-area dealers had anything to do with MWP; as we have noted, MWP had not submitted an application, and four other existing Chicago-area BMW dealers who submitted applications were not approved.

The first contact with MWP made with BMWNA regarding the Mini took place in February 2001, when MWP contacted a BMWNA regional office and requested information on the Mini franchise approval process (which by then had been closed for four months). MWP had no further contact with BMWNA about the Mini until May 11, 2001, when it sent BMWNA a letter stating that it felt that it should receive the Mini pursuant to its existing Dealer Agreement. BMWNA responded on June 12, 2001, stating that the Mini was not included in the BMW Dealer Agreement and that MWP would not receive the Mini because it had not submitted a franchise proposal. MWP did not respond to this letter and took no further action until mid-September 2001, when it filed this lawsuit.

As reports have appeared in the press regarding the anticipated roll-out of the Mini, prospective Mini dealers have begun to receive contacts from interested customers. BMWNA has encouraged the dealer candidates to ask these prospects to "register" on BMWNA's Mini

web site so that they can be sent further information. But most if not all of the dealer candidates are keeping their own prospect lists, and some have even taken deposits, though BMWNA has advised dealers that they are not to do this, and it may be illegal in some states. (On the other hand, BMWNA has taken no action against the candidates who have accepted deposits against its wishes, such as advising them that their applications will be disapproved.) MWP has also received numerous inquiries from customers interested in the Mini, and it is reasonable to assume that other existing BMW dealers who will not be selling the Mini have received similar contacts; to the public, the Mini is closely associated with BMW.

The Mini bears no BMW logo, and it has a construction and features which distinguish it from BMW model automobiles. BMWNA's marketing efforts are, among other things, aimed at ensuring that the Mini can stand on its own as a brand: if the Mini is perceived as simply another BMW, there is a risk that BMW's anticipated introduction of a new, lower-priced model in 2005 will damage Mini sales. Despite this, however, it is beyond question that the public associates the Mini with BMW (partly because BMW AG is producing it and BMWNA is marketing it), and there is a decent chance that the public will end up considering the Mini to be a BMW model.

The Mini will be the smallest automobile sold in North America and will be priced considerably lower than BMW's current models. BMWNA expects that the primary market for the Mini will consist of younger buyers and others who might not be attracted to BMW models due to their higher price. The company also hopes that the Mini will serve as a stepping-stone to future purchases of BMW models.

There is no question that if MWP were a Mini dealer, it would make sales and earn

6

profits from selling the car. Conversely, it will lose customers and profits as a result of not having a Mini franchise. Determining the ultimate loss to a dealer which stems from losing a customer is not a simple task. Automobile purchasers often return to the dealership from which they purchased the auto for service and parts, and depending on their experience with the car and the dealership they may return for future automobile purchases. The losses that stem from a customer not coming through the door in the first place may be somewhat difficult to quantify, though MWP has retained experts in other cases who have made an effort to do so and have testified to damage calculations to a reasonable degree of certainty.

There is no credible evidence indicating, however, that MWP's BMW sales or its profit on those sales (which is considerable) will in any way be harmed by not having the Mini. Finally, the possibility that Mini purchasers might eventually become BMW purchasers is somewhat speculative.

## Discussion

BMWNA previously argued that the Court should not entertain MWP's motion for a preliminary injunction because the Court stayed proceedings on the merits pending arbitration of a threshold issue, namely whether MWP is required to execute the 2001 Dealer Agreement which specifically excludes the Mini. The Court rejected this argument, concluding that even when a case has been referred to arbitration, a court retains the authority to enter a preliminary injunction to preserve the *status quo ante* (which MWP argues is the 1993 Dealer Agreement, which it says entitles it to receive and sell the Mini) pending a decision by the arbitration panel, and it also retains the authority to issue an injunction to preserve the meaningfulness of the arbitration remedy. *See* Orders dated Oct. 21, 2001 and Nov. 15, 2001.

When the Court made those rulings, though the basis for the order compelling arbitration was an agreement to arbitrate a threshold issue, we assumed that the entire case, including MWP's claim that the 1993 Dealer Agreement entitled it to sell Minis, would be determined by the arbitration panel. By the time the preliminary injunction hearing began, however, both sides had agreed that the arbitration panel could consider only the threshold issue, and not the ultimate issue regarding the construction of the 1993 Dealer Agreement. In other words, even if the arbitration panel ruled in favor of MWP and concluded that it was not required to execute the 2001 Dealer Agreement, that would be a mere waystation on the road to victory for MWP: it still would have to return to this Court to litigate the interpretation of the 1993 Agreement. Once this was made clear, it became evident that the Court had the authority to consider the preliminary injunction motion, not just to preserve the effectiveness of the arbitration remedy, but also to preserve the effectiveness of the requested judicial remedy. Thus our authority to consider MWP's preliminary injunction request is without question.

At the close of the preliminary injunction hearing, the Court asked the parties to submit to chambers copies of the exhibits that had been admitted in evidence, *see* Hearing Tr. 348, and also expected to receive copies of any exhibits to which the parties had agreed, as well as identification of any unresolved objections. *See id.* 351. The binder of exhibits that MWP submitted to chambers together with its post-hearing brief contained five exhibits that had neither been offered, admitted, nor agreed to by BMWNA, nor did MWP identify any unresolved objections for the Court to determine. BMWNA strenuously objected to MWP's submission of these exhibits. The Court does not believe that BMWNA would be unfairly prejudiced by admission of these exhibits, as they all concern points that were covered at the hearing and in the

8

parties' briefs (though these specific exhibits were not discussed at the hearing or by BMWNA in its brief). Three of the exhibits – plaintiff's exhibit 38, and defendant's exhibits 93 and 94 – are BMWNA's documents and illustrate points that were covered at the hearing; BMWNA has no separate objection to these other than the claim of unfair surprise. The other two exhibits – plaintiff's exhibits 66 and 67 – are reports submitted in other litigation by experts retained by BMWNA criticizing the methodology used by MWP's experts in that litigation to calculate its lost profits. Though these exhibits were not used at the hearing, the point that they are intended to make was covered in some detail. The exhibits are not hearsay, as they were tendered by BMWNA in other litigation, and are offered to show that BMWNA has objected to lost profits claims in other cases on the grounds that the loss has not been adequately proved. For these reasons, the Court admits these exhibits over BMWNA's objection.

On to the merits. "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong,* 520 U.S. 968, 972 (1997) (per curiam). To obtain a preliminary injunction, MWP must show that it has some likelihood of success on the merits, lacks an adequate remedy at law, and will suffer irreparable harm if the injunction is not granted. *E.g., Re/Max North Central, Inc. v. Cook,* 272 F.3d 424, No. 00-4212, slip op. at 9 (7th Cir. 2001); *Ty, Inc. v. Jones Group, Inc.,* 237 F.3d 891, 895 (7th Cir. 2001). If MWP can make this showing, the Court then weighs the relative harms to the respective parties and any potential harm to non-parties, and the probability of the movant's success on the merits. *Re/Max North Central,* slip op. at 9.

MWP seeks a mandatory injunction, "that is, an injunction requiring an affirmative act by

the defendant." *Graham v. Medical Mutual of Ohio,* 130 F.3d 293, 295 (7th Cir. 1997). Specifically, it requests an order that effectively would require BMWNA to deliver Mini automobiles to MWP, train MWP's Mini sales force, and the like. "'Mandatory preliminary writs are ordinarily cautiously viewed and sparingly issued.'" *Id.* (quoting *Jordan v. Wolke,* 293 F.2d 772, 774 (7th Cir. 1978).

**1.  Likelihood of success**

The threshold of likelihood of success that a preliminary injunction movant must meet is low: "[i]t is enough that the plaintiff's chances are better than negligible." *Sofinet v. Immigration and Naturalization Service,* 188 F.3d 703, 707 (7th Cir. 1999). MWP has met this standard, though just barely. To prevail on the merits, MWP has to clear two hurdles: it must find a way to avoid having to execute the 2001 Dealer Agreement, and it must show that it has a contractual right to sell the Mini under the 1993 Dealer Agreement. Determination of the first of these issues is a matter for the arbitration panel. The Court has no intention of putting its thumb on the scale, and we therefore simply repeat what we have previously said on the subject:

> Though the Court is dubious of MWP's chances before the arbitration panel, we cannot say at this juncture that it has failed to meet [the] low standard [of likelihood of success that applies to a motion for preliminary injunction]. MWP has at least some likelihood of convincing an arbitration panel that Paragraph 30 of the Settlement Agreement preserved its right to protest the not-yet-created standard dealer agreement once it issued, and that so long as a proper challenge is pending, the 1993 agreement governs the parties' relationship.

Order dated Nov. 15, 2001.

By contrast, the construction of the 1993 Dealer Agreement is an issue that this Court ultimately will have to decide, so we have no reticence about dealing with it here. As we have noted, in the 1993 Agreement, BMWNA agreed to sell and deliver to MWP "BMW Products,"

10

defined as including "new passenger car(s) manufactured by BMW or one of its manufacturing subsidiaries, sold by BMWNA, and bearing the trademarks of BMW." The Mini certainly meets the first two of these tests: it is manufactured by BMW or one of its subsidiaries, and it is sold by BMWNA. The parties dispute whether the trademarks borne by the Mini are "the trademarks of BMW." Consideration of the bare language of the agreement would seem to tilt the scales in MWP's favor: BMW acquired the trademarks borne by the Mini, and thus they are, in a general way, "the trademarks of BMW." But at the time of the 1993 Agreement, Mini was not a trademark owned by BMW (and thus it could not have licensed the mark at that time), nor was its ownership by BMW contemplated by the parties. A licensee's rights under a license agreement do not extend to products that did not exist and were not contemplated by the parties at the time of the agreement. *See McGraw-Hill Companies, Inc. v. Vanguard Index Trust,* 139 F. Supp. 2d 544, 555-56 (S.D.N.Y. 2001) (licensee's right to use mark did not extend to new products introduced by licensee, as they were not contemplated at the time of the license); *Board of Trade of the City of Chicago v. Dow Jones & Co.,* 108 Ill. App. 3d 681, 688-89, 439 N.E.2d 526, 532 (1982) (use of market data that was not commercially possible at time of contract "could not have been part of the bargain when the contract was formed.").

It is conceivable that this issue of construction of the 1993 Dealer Agreement ultimately could result in entry of summary judgment against MWP. Though we make no final decision on the point at this juncture, we conclude that MWP's likelihood of success on the merits is slim.

## 2. Irreparable injury and adequacy of legal remedy

Without the Mini, MWP will lose the profits that it would make from selling that automobile. But that is not an irreparable injury; rather it is eminently quantifiable based on

11

BMWNA's allocations of Minis to other similarly situated dealers and likely profit margins. And though MWP's inability to sell new Minis will also mean that it will lose service and parts revenues from follow-up business, the Court is not persuaded by the evidence that this is an irreparable injury either. Rather, based on the evidence presented at the hearing, it seems likely that the revenue stream that a dealership is likely to earn from a new car buyer can be estimated and quantified to a degree sufficient to permit a damage award. The fact that BMWNA's experts in other litigation have criticized the methodology used by MWP's experts in that litigation does not mean that MWP's damages are unquantifiable. The lost profit figure likely cannot be predicted with precision, but that is common with lost profit claims and does not make the damages unrecoverable or the injury irreparable. *See, e.g., Kealey Pharmacy & Home Care Services, Inc. v. Walgreen Co.*, 761 F.2d 345, 353 (7th Cir. 1985) (Wisconsin law).

MWP argues that its reputation will be damaged if it is not permitted to sell the Mini, as prospective customers may think that it is somehow a lesser-quality BMW dealer. But MWP's evidence submitted in support of that argument was unpersuasive. Even if the public associates the Mini with BMW, there was no credible evidence that prospective BMW purchasers will be driven away from MWP's dealership simply because it does not offer Minis for sale and does not have the Mini logo on its signs. Barely 20% of the existing North American BMW dealers will be authorized to sell the Mini; MWP has in no way been singled out. MWP has offered no persuasive evidence that prospective customers will take the fact that it has no Minis for sale as any sort of a commentary on the quality of its dealership.[2]

---

[2] Among other things, there is no indication that MWP's sales of BMWs have been hurt thus far even though MWP, unlike the three Chicago-area Mini dealer candidates approved by BMWNA, has been unable to advertise the upcoming availability of Minis.

Finally, it is likely that the availability of the Mini will bring customers into BMW dealerships who would not otherwise go there, and some of those customers may end up (now or in the future) buying BMW's from those dealerships. The injury that MWP might suffer from these lost prospective customers is difficult to quantify. But there is no credible evidence that the injury is likely to be significant. The notion that a person would come to a dealership with the express intention of looking at a Mini and then end up buying a BMW with a price that is higher by $10,000 or more is rather hard to swallow. Because BMWNA has mandated that Mini dealers have a separate sales force devoted exclusively to Mini sales, Mini salespeople will have no incentive to push customers into purchasing higher-priced BMW's. Finally, in the long term, the impact of the claimed injury to MWP will be blunted by BMW's plans to begin offering a lower-priced BMW model in 2005, which one can reasonably expect will bring customers with a lower price point into BMW dealers whether or not they sell Minis.

In sum, of the various injuries claimed by MWP, it has been able to make a showing of only one type that might be considered to be "irreparable" in the sense that it would be nearly impossible to account for it with damages. But it has failed to show that this is a significant injury; based on the evidence presented it appears to be significantly less serious than the quantifiable injury that MWP will experience from its lost profits on Mini sales.

### 3. Risk of harm to BMWNA and non-parties

BMWNA and entities who are not party to this case would be harmed if the Court granted a preliminary injunction. BMWNA is operating under production constraints that have required it to limit the number of Mini dealers in order to ensure that those dealers' Mini product lines are profitable. Though those dealers are also BMW dealers and are presumably making profits from

13

sales of BMW automobiles, BMWNA has made a reasonable corporate decision to require the Mini to stand or fall on its own and to require dealers to sell the Mini line separately from BMWs. In order for BMWNA's re-introduction of the Mini to the North American market to succeed, and because of the significant investments made by Mini dealers, it is important for dealers to be able to turn a profit on their sales of the Mini. This, together with the production constraints under which BMWNA is operating, has required the company to limit the number of Mini dealers to only 70 nationwide. Every Mini that would be sent to MWP in the event of a preliminary injunction is a car taken away from another dealer.

This might be thought an insignificant loss to the other dealers. But the fact is that those other dealers have made significant investments of time, money, and other resources in order to win approval as Mini dealers and to give themselves the best chance of turning a profit. Each of them underwent searching inquiries during an extended application process. Each of them applied knowing that the number of dealers would be limited. And though BMWNA has made no contractual commitments concerning the number of cars available, each of the dealer candidates was aware of BMWNA's intention to make equivalent allocations of the limited number of automobiles available and to provide enough vehicles to enable each dealer to make a profit. These were likely significant factors in many of the candidates' decisions to apply.

MWP, for its part, made a conscious decision to avoid the application process that it knew BMWNA had imposed and that it knew the other applicants were pursuing. Though it stands in no better stead than any of those dealers, it decided to rest on its rights, whatever they were, under the 1993 Agreement. And now that the other dealer candidates are in sight of the finish line, MWP wants to join the race along with the leaders.

14

Granting an injunction under these circumstances would create distrust on the part of the prospective Mini dealers and would discourage other Mini dealers in the Chicago area from complying with their letters of intent, which were entered into with the understanding that there would be only three Mini dealers in this area. A significant investment that may have made sense under those assumptions may make a good deal less sense with a fourth competitor plopped down in their midst.

MWP argues that the buying public will benefit if another Mini dealer is added to the local market. The evidence in this regard is speculative, and any actual benefit from having four dealers rather than three in a market the size of the Chicago metropolitan area is incremental at best.

### 4. Balancing of harms

MWP's low likelihood of success requires it to make a showing that the balance of harms tips more greatly in its favor than would be required for a plaintiff with a greater likelihood of success. *Ty*, 237 F.3d at 895. *See also Re/Max North Central*, slip op. at 9 (court must weigh relative harms to the respective parties and movant's probability of success). This MWP has failed to do. MWP has not proven a risk of significant irreparable harm, and others – most importantly non-parties – would have their expectations upset and would be harmed if an injunction were granted. The balance of harms does not tip in MWP's favor at all, let alone enough to overcome MWP's minimal likelihood of success on the merits.

### Conclusion

Defendant's objections to plaintiff's submission of plaintiff's exhibits 38, 66, 67, and defendant's unused exhibits 93 and 94, are overruled. The Court denies plaintiff's motion for a

15

preliminary injunction [docket item 10-2]. The case is set for a status hearing on January 17, 2001 at 9:30 a.m.

                                                                              _____
                                                                              MATTHEW F. KENNELLY
                                                                              United States District Judge

Date:   December 17, 2001